**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| GARY LEE LUKE and | § | |
| SHELLEY DAWN LUKE, | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. _____ |
| | § | |
| v. | § | |
| | § | With Jury Demand Endorsed |
| SHELLPOINT MORTGAGE | § | |
| SERVICING, LLC and | § | |
| FEDERAL HOME LOAN MORTGAGE | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs, Gary Lee Luke ("Mr. Luke") and Shelley Dawn Luke ("Ms. Luke") (collectively "Plaintiffs"), by and through counsel, and for their Complaint against Defendants, Shellpoint Mortgage Servicing, LLC ("Shellpoint") and Federal Home Loan Mortgage Corporation ("Freddie Mac") state as follows:

### I. INTRODUCTION

1.      Plaintiffs assert claims against Defendants that Defendants engaged in willful, knowing, and malicious actions against them, in furtherance of their efforts to collect a debt after it was discharged in Plaintiffs' Chapter 7 bankruptcy, such actions being part of Defendants' policies, procedures, practices and malicious and illegal design to profit by collecting on debts discharged in bankruptcy by taking advantage of unsophisticated debtors, like Plaintiffs.

1

2. Specifically, Plaintiffs assert claims against Defendants for their violations of: 1) Chapter 41, the Consumer Credit Protection Credit Act, of Title 15 (Commerce and Trade) of the United States Code, specifically, 15 U.S.C. § 1681 *et seq*., (known as the Fair Credit Reporting Act, "FCRA"); 2) the Tex. Fin. Code § 392.001 *et. seq.,* known as the Texas Debt Collection Act ("TDCA"); the 3) 15 U.S.C. §§ 1692 *et seq.,* known as the Fair Debt Collection Practices Act (the "FDCPA")(as to Shellpoint only); 4) the common law tort of invasion of privacy; 5) the discharge injunction of the United States Bankruptcy Court for the Northern of Texas; and 6) 47 U.S.C. § 227 *et. seq*, known as the Telephone Consumer Protection Act, ("TCPA"). Plaintiffs seek to recover actual, statutory, and punitive damages, and legal fees and expenses against Defendants.

## II. PARTIES

3. Plaintiffs are natural persons residing in Tarrant County, Texas and are "consumers" as defined by the FCRA, TDCA and FDCPA.

4. Defendant Shellpoint is a foreign limited liability company which may be served by delivering citation to its registered agent, Corporation Service Company, 211 E. 7th Street Suite 620, Austin, Texas78701.

5. Defendant Freddie Mac is a foreign corporation which may be served by delivering citation to its Chief Executive Officer, Donald H. Layton at 8200 Jones Branch Dr., McLean, VA 22102-3110.

6. Defendants are "persons" and "users" of consumer credit and other financial information, as said terms are defined under the FCRA.

7.     The debt at issue that Defendants were attempting to collect from Plaintiffs was a "consumer debt" as defined by Tex. Fin. Code § 392.001(2) and 15 U.S.C. § 1692a.

8.     Defendant Shellpoint is a "debt collector" as defined by Tex. Fin. Code § 392.001(6) and 15 U.S.C. § 1692a.

9.     Defendants are furnishers of consumer credit information to Trans Union, LLC ("TransUnion"), Equifax, Inc. ("Equifax"), and Experian Information Solutions, Inc. ("Experian") (collectively the "Credit Reporting Agencies" or "CRAs").

### III. JURISDICTION AND VENUE

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 1334 and 1337(a) and 15 U.S.C. § 1681p and 28 U.S.C. §§2201-2202.

11.    Venue in this district is proper because Defendants transact business in this district, Plaintiffs filed their subject bankruptcy case in this district and received a discharge of the subject debt in their bankruptcy case from a U.S. District Court in this district.

### IV. FACTUAL ALLEGATIONS

**A.     The Discharge of the Subject Debt in Plaintiffs' Bankruptcy Case**

12.    On September 29, 2014, Plaintiffs filed for bankruptcy under Chapter 7 of the U.S. Bankruptcy Code in case number 14-34624-bjh7 ("Bankruptcy Case") in the Northern District of Texas, Dallas Division ("Bankruptcy Court").

13.    Prior to Plaintiffs filing their Bankruptcy Case, Bank of America, as prior servicer of the subject debt for Freddie Mac, the owner of the debt, asserted a pre-petition claim against Plaintiffs in an attempt to collect a consumer debt they allegedly owed requiring Plaintiffs to pay money arising out of transactions in which money, property, insurance, or services were the

subject thereof, and the same were primarily for personal, family, or household purposes. In their Bankruptcy Case, Plaintiffs listed the subject debt underlying the claim at issue as an unsecured debt on Schedule "F," identified as Loan or Account No. xxxxx3462 (the "Loan" or "Account"), as Plaintiffs had previously conveyed title to the subject real property that was collateral for the debt to a third party prior to filing their Bankruptcy Case. The real property at issue was located at 945 Copenhagen Way, Winter Gardens, FL 34787 ("Property").

14.     On September 29, 2014, Plaintiffs filed a mailing matrix with the Bankruptcy Court that provided Bank of America's correct address.

15.     On October 2, 2014, the Bankruptcy Noticing Center for the Bankruptcy Court sent a copy of the "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines" ("341 Notice") for the Bankruptcy Case by first class mail to Bank of America, as servicer and agent of the debt for Freddie Mac; this constituted notice to Bank of America and Freddie Mac of the Bankruptcy Case. The 341 Notice warned all creditors in conspicuous language against violating the automatic stay pursuant to 11 U.S.C. §362. The United States Postal Service did not return the 341 Notice sent to Bank of America, so there is a presumption it was received.

16.     On October 13, 2014, Bank of America filed a Notice of Appearance in the Bankruptcy Case, and on October 24, 2014, a Motion for Relief from Stay claiming a security interest in the Property.

17.     On December 1, 2014, the Bankruptcy Court granted Bank of America's Motion for Relief from Stay as to the Property.

18.     On January 7, 2015, the Bankruptcy Court issued an order granting Plaintiffs a discharge ("Discharge Order") (the said order followed Official Form B18, including the

explanatory language contained therein). The order discharged Plaintiffs from any liability for the subject pre-petition claim. Included with the Discharge Order was an explanation of the general injunction prohibiting those holding pre-petition claims from attempting to collect those claims. The Discharge Order and its notice warned all creditors in conspicuous language that "**Collection of Discharged Debts Prohibited**" and that "a creditor is not permitted to contact a debtor by mail, phone, or otherwise…or take any other action to collect a discharged debt from the debtor."

19.     On January 10, 2015, the Bankruptcy Noticing Center mailed a copy of the Discharge Order to Bank of America by first class mail; this mailing constituted formal notice to Bank of America, as servicer of the debt and agent of Freddie Mac, of the discharge granted in Plaintiffs' Bankruptcy Case and the replacement of the automatic stay with the discharge injunction of 11 U.S.C. §524(a). The Discharge Order and notice mailed to Bank of America was not returned and there is a presumption it was received.

20.     A true and correct copy of the Discharge Order is attached hereto as Exhibit "A."

21.     At no time during the pendency of the Bankruptcy Case did Defendants, Bank of America or any other person or entity object to or dispute the details of the subject claim contained in Schedule "F" to Plaintiffs' Petition filed in their Bankruptcy Case.

22.     At no time during the pendency of the Bankruptcy Case did Plaintiffs reaffirm the subject claim or debt with any person or entity.

23.     At no time during the pendency of Plaintiffs' Bankruptcy Case was the subject pre-petition claim declared to be non-dischargeable by the Bankruptcy Court.

**B.     Defendants' Attempts to Collect the Subject Discharged Debt from Plaintiffs**

24.     Following the January 7, 2015 discharge being granted in Plaintiffs' Bankruptcy Case, Defendants engaged in debt collection activity against Plaintiffs on the subject discharged debt by: (1) Shellpoint accepting the Account for collection and Freddie Mac assigning the discharged debt to Shellpoint to collect on; (2) Freddie Mac impermissibly accessing and reviewing Mr. Luke's consumer credit report with Equifax; (3) Freddie Mac misrepresenting the status of the debt to Equifax in order to gain access to Mr. Luke's confidential personal information; (4) Shellpoint sending Plaintiffs billing statements and letters requesting Plaintiffs take actions to coerce payment from them of the subject discharged debt; and (5) Shellpoint repeatedly calling Plaintiffs on their cell phones in furtherance of its attempts to collect the subject discharged debt. At all times at issue, Shellpoint was acting as servicer and agent for Freddie Mac; thus, Freddie Mac is jointly and severally liable for Shellpoint's actions at issue.

### 1.     Defendants Assigning or Accepting the Account for Collection Post-Discharge

25.     After the discharge was granted in Plaintiffs' Bankruptcy Case, Defendant Freddie Mac, as the owner of the subject discharged debt, assigned the Account to Shellpoint to collect on, and Shellpoint accepted the discharged Account for servicing and collections and began its collection actions against Plaintiffs on it. Prior to these transactions, Freddie Mac was on notice of Plaintiffs' Bankruptcy Case and discharge from information it received from Bank of America, its prior agent and servicer on the Account, or through another source. Shellpoint acquired information and/or records of Plaintiffs' Bankruptcy Case and discharge from Bank of America, Freddie Mac and/or independently.

### 2.     Defendant Freddie Mac's Illegal Credit Pulls of Plaintiffs' Consumer Credit Report

6

26.     Despite the change in the legal status of the Account and underlying debt upon it discharge in Plaintiffs' Bankruptcy Case, making the debt legally uncollectible and closing the Account by operation of law, Freddie Mac, post-discharge, impermissibly accessed and reviewed Mr. Luke's consumer credit report with Equifax on at least four (4) occasions as follows:

1)  On February 3, 2015, Freddie Mac impermissibly accessed and reviewed Mr. Luke's credit report with Equifax;

2)  On March 3, 2015, Freddie Mac impermissibly accessed and reviewed Mr. Luke's credit report with Equifax;

3)  On April 7, 2015, Freddie Mac impermissibly accessed and reviewed Mr. Luke's credit report with Equifax; and

4)  On May 5, 2015, Freddie Mac impermissibly accessed and reviewed Mr. Luke's credit report with Equifax.

27.     Redacted excerpts of the relevant portions of Mr. Luke's Equifax credit report showing Defendant's impermissible account reviews and inaccurate reporting are attached hereto as Exhibit "B."

**3.      Defendant Freddie Mac's Furnishing of False Information to Equifax to Gain Access to Plaintiff's Confidential Personal Information and Credit Report.**

28.     In order to gain access to Mr. Luke's Equifax credit report and confidential information therein, Freddie Mac reported to Equifax that its purpose for accessing Mr. Luke's credit report was allegedly for "an account review or other business transaction;" yet, at all relevant times, the debt on the Account had been discharged and there was no legitimate reason for Freddie Mac to access or review Plaintiffs' credit reports from any of the CRAs. In actuality, Freddie Mac was trying to gain confidential information about Plaintiffs in furtherance of its collection efforts on the subject discharged debt. If it denies this was its purpose, then Freddie

Mac was trying to gain access to Mr. Luke's personal financial information which is protected by law.

29.     Freddie Mac's illegal access to Mr. Luke's credit report occurred as recently as May 5, 2015, long after the discharge of the debt at issue.

### 4.     Defendant Shellpoint's Post-Discharge Collection Calls to Plaintiffs

30.     On many occasions after Plaintiffs received their bankruptcy discharge and after Shellpoint acquired the servicing rights on the Account, Shellpoint made collection calls to Plaintiffs' cellular phones on the subject discharged debt as follows:

1)     On July 25, 2015 at 10:19 a.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the subject discharged debt;

2)     On July 28, 2015 at 1:02 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

3)     On July 30, 2015 at 1:17 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

4)     On August 4, 2015 at 5.26 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

5)     On August 5, 2015 at 2:22 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

6)     On August 6, 2015 at 5:09 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

7)     On August 11, 2015 at 4:31 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

8)     On August 11, 2015 at 4:34 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

9)     On August 13, 2015 at 5:05 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

10)    On August 14, 2015 at 2:12 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt;

11) On August 21, 2015 at 2:49 p.m., a representative of Shellpoint called Mr. Luke on his cell phone in an attempt to collect the discharged debt; and

12) On August 21, 2015 at 1:02 p.m., a representative of Shellpoint called Ms. Luke on her cell phone in an attempt to collect the discharged debt.

**5.      Defendant Shellpoint's Collection Statements and Correspondence it Sent to Plaintiffs Post-Discharge**

31.    On or about July 21, 2015, Shellpoint sent Plaintiffs a monthly statement on the Account, complete with payment coupon and return envelope demanding payment on the Account. In the Statement, the "**Explanation of Amount Due**" Section specifically demands a **"Total Amount Due $16,854.72,"** comprised of an "Overdue Payment $15,591.11" and a "Regular Monthly Payment $1,263.61." The Statement also contains a **Delinquency Notice" informing Plaintiffs that they "are late" on their "mortgage payments" and that "failure to bring your loan current may result in fees and foreclosure" and that "[a]s of 07/21/2015, you are 354 days delinquent on your mortgage loan."

32.    A redacted copy of this July 21, 2015 Statement has been attached hereto as Exhibit "C" and is incorporated herein by reference.

33.    On or about August 7, 2015, Shellpoint sent Plaintiffs a notice with the "Subject: **Please provide insurance information for** 945 COPENHAGEN WAY, WINTER GARDEN, FL 34787." The Notice further states that "[b]ecause hazard insurance is required on your property, we plan to buy insurance for your property." However, the Notice continues that "[y]ou must pay us for any period during which the insurance we buy is in effect but you do not have insurance." Also, the Notice instructs Plaintiffs to "immediately provide us with your insurance information" and that Shellpoint "urge" Plaintiffs "to contact your insurance agent or company and have them provide us with current evidence of hazard insurance for your property" and this

"information must be provided in writing" and can be faxed or mailed to the number and address provided. Moreover, in furtherance of its efforts to coerce Plaintiffs into making payments and establish contact with Shellpoint, the notice reads "[t]he insurance we buy: May be more expensive than the insurance you can buy yourself" and "[m]ay not provide as much coverage as an insurance policy you buy yourself." The Notice further includes the FDCPA Mini-Miranda warning stating the Shellpoint "is a debt collector" and "[t]his letter is an attempt to collect a debt and any information obtained will be used for that purpose."

34.     A redacted copy of this August 7, 2015 Notice has been attached hereto as Exhibit "D" and is incorporated herein by reference.

35.     On or about September 8, 2015, Shellpoint sent Plaintiffs another notice with the "Subject:   **Second and final notice – Please provide insurance information for** 945 COPENHAGEN WAY, WINTER GARDEN, FL 34787." The Notice states that "your hazard insurance has expired and we do not have evidence that you have obtained new coverage." Next, the Notice states "[b]ecause hazard insurance is required on your property, we plan to buy insurance for your property," but that "[y]ou must pay us for any period during which the insurance we buy is in effect but you do not have insurance." Also, the Notice instructs Plaintiffs to "immediately provide us with your insurance information" and that Shellpoint "urge" Plaintiffs "to contact your insurance agent or company and have them provide us with current evidence of hazard insurance for your property" and this "information must be provided in writing" and can be faxed or mailed to the number and address provided. Moreover, in furtherance of its efforts to coerce Plaintiffs into making payments and establish contact with Shellpoint, the notice reads "[t]he insurance we buy: Will cost an estimated $3,088.80 annually,

which may be more expensive than the insurance you can buy yourself" and "[m]ay not provide as much coverage as an insurance policy you buy yourself." The Notice further includes the FDCPA Mini-Miranda warning stating the Shellpoint "is a debt collector" and "[t]his letter is an attempt to collect a debt and any information obtained will be used for that purpose."

36.     A redacted copy of this September 8, 2015 Notice has been attached hereto as Exhibit "E" and is incorporated herein by reference.

## V. GROUNDS FOR RELIEF - COUNT I

### FAIR CREDIT REPORTING ACT (FCRA 15 U.S.C. §1681 *et. seq*)

37.     Plaintiffs repeat, re-allege, and incorporate by reference all paragraphs above as if fully rewritten here.

38.     The FCRA establishes very specific rules limiting when and why an entity can obtain a consumer report:

(f) Certain use or obtaining of information prohibited. – A person shall not use or obtain a consumer report for any purpose unless –

(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

(2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

*See* 15 U.S.C. § 1681b (f).

39.     Section 1681b(a)(3) lists the all-inclusive purposes for which a consumer report can be obtained:

(a) In General. – * * * [A] consumer reporting agency may furnish a consumer report under the following circumstances and no other:

***

(3) To a person which it has reason to believe –

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer;

***

(F) otherwise has a legitimate business need for the information * * *

(ii) to review an account to determine whether the consumer continues to meet the terms of the account.

*See* 15 U.S.C. § 1681b (a)(3).

40.     After the Discharge Order was signed and entered in Plaintiffs' Bankruptcy Case, Freddie Mac requested and obtained access to Mr. Luke's consumer credit report from Equifax and reviewed such report, as stated hereinabove.

41.     On such occasions, Freddie Mac misrepresented to Equifax that its requests to access Mr. Luke's credit reports were so it could monitor, review or insure its account or to complete a credit application.

42.     When requesting and obtaining access to Mr. Luke's credit information from Equifax, as described hereinabove, Freddie Mac had actual knowledge it did not have a permissible purpose to obtain such access to his consumer credit reports from any of the CRAs.

43.     At all relevant times, Freddie Mac had actual knowledge that as of the discharge being granted in Plaintiffs' Bankruptcy Case, the discharge injunction was in affect and Freddie Mac was legally prohibited from pursuing any collection against Plaintiffs on the subject discharged debt or communicating with Plaintiffs about the Account and the underlying discharged debt to justify an account review of their credit information. At all relevant times, Freddie Mac had actual knowledge it did not have a permissible purpose to access Plaintiffs' credit reports post-discharge.

44.     When Freddie Mac accessed Mr. Luke's Equifax consumer credit report post-discharge, it had actual knowledge that Mr. Luke had not requested new credit from it or initiated a credit transaction with it at any time since filing his Bankruptcy Case. Thus, Freddie Mac had actual knowledge it did not have a permissible purpose to access Mr. Luke's credit reports and confidential information therein as it did.

45.     At all relevant times subsequent to their bankruptcy discharge, Freddie Mac had actual knowledge Plaintiffs did not authorize access and reviews of their consumer reports by Freddie Mac. Accordingly, Freddie Mac had actual knowledge it did not have a permissible purpose to access Plaintiffs' credit reports and information therein when it accessed Mr. Luke's credit report at issue.

46.     For Freddie Mac to request and obtain Plaintiffs' private personal and financial information, in the face of actual knowledge it had no permissible purpose to do so, constitutes its knowing and willful violations of the FCRA.

47.     After a reasonable time to conduct discovery, Plaintiffs believe they can prove Freddie Mac requested and obtained Plaintiffs' private personal and financial information from Equifax for the illegal purpose of attempting to collect on the subject discharged debt.

48.     After a reasonable time to conduct discovery, Plaintiffs believe they can prove Freddie Mac used false pretenses, namely the representation it intended to use Mr. Luke's consumer report for a permissible account review or collection purpose, when it had no such permissible purpose(s), in order to obtain Plaintiffs' private personal and financial information for the illegal purpose of attempting to collect on the subject discharged debt.

49.     After a reasonable time to conduct discovery, Plaintiffs believe they can prove, Freddie Mac is unwilling or unable to prevent its system(s) or agents from requesting and obtaining Mr. Luke's consumer report without a permissible purpose, thereby subjecting Mr. Luke to having his private, personal and financial information disclosed without his consent, authorization or other legal justification.

50.     As a direct and proximate result of Freddie Mac's conduct, as outlined above, Mr. Luke has suffered, and will continue to suffer, substantial injury, including, but not limited to, mental anguish and emotional distress, entitling him to an award of actual damages in an amount to be proved at trial, plus attorneys' fees together with the costs of this action pursuant to 15 U.S.C. § 1681o.

51.     The injuries suffered by Mr. Luke as a result of Freddie Mac's impermissible account reviews and credit pulls was attended by circumstances of fraud, malice, and willful and wanton misconduct, entitling Mr. Luke to punitive damages pursuant 15 U.S.C. § 1681n(a)(2).

52.     Since Freddie Mac's illegal credit pulls will have a continuing adverse impact on Mr. Luke and the violations are ongoing in nature, Freddie Mac is liable for any and all future harm suffered by Mr. Luke as a result of its conduct.

## VI. GROUNDS FOR RELIEF - COUNT II

### FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)

53.     Plaintiffs reallege and incorporated herein all of the above paragraphs as if set forth herein in their entirety. Plaintiffs assert claims against Shellpoint only under the FDCPA.

54.     The Fair Debt Collection Practices Act ("FDCPA") is a comprehensive statute which prohibits a catalog of activities in connection with the collection of debts by third parties. *See* 15 U.S.C. § 1692 *et seq.* The FDCPA imposes civil liability on any person or entity that violates its provisions, and establishes general standards of debt collector conduct, defines abuse, and provides for specific consumer rights. *See* 15 U.S.C. §1692k. The operative provisions of the FDCPA declare certain rights to be provided to or claimed by debtors, forbid deceitful and misleading practices, prohibit harassing and abusive tactics, and proscribe unfair or unconscionable conduct, both generally and in a specific list of disapproved practices.

55.     In particular the FDCPA broadly enumerates several practices considered contrary to its stated purpose, and forbids debt collectors from taking such action. The substantive heart of the FDCPA lies in three broad prohibitions. First, a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §1692d. Second, a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. §1692e. Third, a "debt collector may not use unfair or

unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §1692f. The FDCPA is designed to protect consumers from unscrupulous collectors, whether or not there exists a valid debt, broadly prohibits unfair or unconscionable collection methods, conduct which harasses, oppresses or abuses any debtor, and any false, deceptive or misleading statements in connection with the collection of a debt.

56.     In enacting the FDCPA, the United States Congress found that "[t]here is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," which "contribute to the number of personal bankruptcies, to marital instability, the loss of jobs, and to invasions of individual privacy." 15 U.S.C. §1692a. Congress additionally found existing laws and procedures for redressing debt collection injuries to be inadequate to protect consumers. *See* 15 U.S.C. §1692b.

57.     Congress enacted the FDCPA to regulate the collection of consumer debts by debt collectors. The express purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. §1692e.

58.     The FDCPA is a strict liability statute, which provides for actual and statutory damages upon the showing of a single violation. *See Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62-3, (2d Cir. 1993); *see also Taylor v. Perrin, Landry, DeLaunay & Durand*, 103 F.3d 1232 (5th Cir. 1997). "Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages." *Russell v. Equifax A.R.S.*, 74 F.3d 30 (2d Cir. 1996); *see also Gearing v. Check Brokerage Corp.*, 233 F.3d 469 (7th Cir.

16

2000) (holding unintentional misrepresentation of debt collector's legal status violated FDCPA); *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993).

59.     The FDCPA is a remedial statute and therefore must be construed liberally in favor of the debtor. *Sprinkle v. SB&C Ltd*., 472 F. Supp. 1235 (W.D. Wash. 2006). The remedial nature of the FDCPA requires that courts interpret it liberally. *Clark v. Capital Credit & Collection Services, Inc*., 460 F.3d 1162 (9th Cir. 2006). "Because the FDCPA, like the Truth in Lending Act (TILA) 15 U.S.C. §1601 *et seq*., is a remedial statute, it should be construed liberally in favor of the consumer." *Johnson v. Riddle*, 305 F.3d 1107 (10th Cir. 2002).

60.     The FDCPA is to be interpreted in accordance with the "least sophisticated consumer" standard. *See Brown v. Card Serv. Ctr*, 464 F.3d 450, 453 fn1 (3d Cir. 2006); *Graziano v. Harrison*, 950 F.2d 107, 111, fn5 (3rd Cir. 1991). The FDCPA was not "made for the protection of experts, but for the public - that vast multitude which includes the ignorant, the unthinking, and the credulous, and the fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *Id*. The least sophisticated consumer standard serves a dual purpose in that it ensures protection of all consumers, even naïve and trusting, against deceptive collection practices, and protects collectors against liability for bizarre or idiosyncratic interpretations of collection notices. *See Clomon*, 988 F.2d at 1318.

61.     To prohibit deceptive practices, the FDCPA, at 15 U.S.C. § 1692e, outlaws the use of false, deceptive, and misleading representations or means in connection with the collection of any debt and sets forth a non-exhaustive list of certain *per se* violations of false and deceptive collection conduct. *See* 15 U.S.C. § 1692 e(1) - (16).

17

62.     Upon information and belief, all of Shellpoint's actions at issue described hereinabove are the manifestation of its practice and policy to ignore the provisions of the Bankruptcy Code applicable to it and illegally collect or attempt to collect pre-petition debts from unsophisticated debtors.

## VI. GROUNDS FOR RELIEF - COUNT III

### TEXAS FINANCE CODE – UNFAIR DEBT COLLECTION

63.     Plaintiffs repeat, re-allege, and incorporate by reference all paragraphs above as if fully rewritten here.

64.     Defendants have violated the Texas Finance Code in numerous ways including, but not limited to, the following:

a)     Tex. Fin. Code § 392.301(a)(8), which prohibits Defendants from taking an action prohibited by law, since the FCRA prohibits accessing and reviewing a consumer credit report without a permissible purpose (Freddie Mac) and the bankruptcy discharge injunction prohibits collection of debts discharged in bankruptcy, Defendants' actions at issue were also a violation of the Texas Finance Code. Also, Defendants violated Plaintiffs' privacy rights and such actions also constituted a violation of the Texas Finance Code and Shellpoint's calls at issue made to Plaintiffs' cellular phones constitute violations of the TCPA;

b)     Tex. Finance Code Section 392.302(4), which provides that "[i]n debt collection, a debt collector may not oppress, harass, or abuse a person by causing a telephone to ring repeatedly or continuously, or making repeated or continuous telephone calls, with the intent to harass a person at the called number, Shellpoint, independently

and acting as an agent for Freddie Mac, violated this provision by making the collection calls at issue to Plaintiffs post-discharge;

c)     Tex. Fin. Code § 392.304(a)(8), which prohibits Defendants from misrepresenting the character, extent, or amount of Plaintiffs' debt, since Freddie Mac misrepresented to Equifax it had a permissible purpose under the FCRA to access Mr. Luke's credit reports, *e.g.* that it was monitoring its account or for a legitimate business transaction, and Defendants misrepresented to Plaintiffs in the notices and statement at issue, and in collection phone calls Shellpoint placed to Plaintiffs post-discharge, as stated hereinabove, that the subject discharged debt was past due, owing and collectible, or that Plaintiffs were obligated to purchase hazard insurance on the Property post-discharge, those were misrepresentations of the status of debt at issue; and

d)     Tex. Fin. Code § 392.304(a)(19), which prohibits Defendants' use of false representations or deceptive means to collect a debt, since the debt at issue had been discharged in Plaintiffs' Bankruptcy Case at all relevant times, and there were no post-discharge business transactions between the Plaintiffs, for the same reasons stated in the previous paragraph, Defendants actions at issue were taken to mislead Plaintiffs into believing they were legally responsible for the amounts no longer due and owing on the Account post-discharge. Accordingly, the only conclusion that can be drawn is Defendants were trying to coerce payment of the discharged debt from Plaintiffs or gather and obtain information about Plaintiffs in furtherance of their attempts to collect the discharged debt. Defendants' actions at issue were deceptive means to collect debt

since the subject debt on the Account had been discharged and was legally uncollectible from Plaintiffs.

65.     Under Tex. Fin. Code Ann. § 392.403, Defendants' actions at issue were violations of the TDCA; therefore making them liable to Plaintiffs for actual damages, statutory damages, injunctive relief, costs, and reasonable attorney's fees. Plaintiffs' injuries resulted from Defendants' gross negligence, malice, and/or actual fraud, which entitle Plaintiffs to punitive damages.

66.     Due to Defendants' and/or their agents' conduct at issue, Plaintiffs were forced to hire counsel and their damages include reasonable attorney's fees incurred in prosecuting their claims.

## VIII. GROUNDS FOR RELIEF - COUNT IV

### INVASION OF PRIVACY

67.     Plaintiffs restate and reiterate herein all paragraphs as above, as if stated herein in their entirety.

68.     Defendants made offensive contacts with Plaintiffs through Shellpoint's post-discharge notices, statement and phone calls, in furtherance of their efforts to collect the subject discharged debt, this constituted an invasion of Plaintiffs' private affairs. These invasions were ones that would be highly offensive to a reasonable person because Defendants were forbidden from contacting Plaintiffs to collect on the subject discharged debt and Plaintiffs reasonably believed they would not be harassed and contacted by Defendants in furtherance of any collection matters related to the subject discharged debt after its discharge in Plaintiffs' Bankruptcy Case. However, Shellpoint's wrongful acts caused injury to Plaintiffs.

69.     Plaintiffs' injuries resulted from Defendants' malice which entitles Plaintiffs to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

## VIII. GROUNDS FOR RELIEF – COUNT V

### VIOLATION OF THE BANKRUPTCY DISCHARGE INJUNCTION

70.     Plaintiffs repeat, re-allege, and incorporate herein all previous paragraphs above as if set forth herein in their entirety.

71.     At all times material to this proceeding, Defendants had actual knowledge about Plaintiffs' Bankruptcy Case and the discharge of the debt at issue.

72.     Defendant Shellpoint acquired the servicing rights on the Account, post-discharge, and began attempting to collect and continued to collect on the subject discharged debt from Plaintiffs post-discharge, independently and as an agent of Freddie Mac, as evidenced by the notices and statement it sent to Plaintiffs and the collection calls it made to Plaintiffs on their cell phones. Further, Freddie Mac's impermissible credit pulls and account reviews is further evidence that Freddie Mac was attempting to collect on the subject debt.

73.     Defendants failed to cease their debt collection activity on the debt at issue when they became aware Plaintiffs filed for bankruptcy protection and the subject debt had been discharged in Plaintiffs' Bankruptcy Case.

74.     Defendants aforesaid actions were willful acts and constitute efforts to collect the discharged debt from Plaintiffs in violation the discharge injunction of 11 U.S.C. §524(a). Defendants' failure to comply with the aforesaid laws, in light of being on notice of Plaintiffs' Bankruptcy Case and discharge and the effect of the discharge, illustrates their contempt for federal law and the discharge injunction.

75.     The actions of Defendants at issue constitute a gross violation of the discharge injunction as set forth in 11 U.S.C. §524(a)(1)-(3).

76.     The facts and background stated above demonstrate that Defendants willfully violated the orders and injunctions of the Bankruptcy Court as they concern the chapter 7 bankruptcy filed by Plaintiffs. With this prima facie showing, the duty is on Defendants to show, as their only defense, a present inability to comply with the orders and injunctions of the Bankruptcy Court that goes beyond a mere assertion of inability. Failing a showing of a present inability to comply with the orders and injunctions of the Bankruptcy Court by Defendants, Plaintiffs must prevail on their claims, and Defendants must be held liable for willfully violating the orders and injunctions of the Bankruptcy Court with regard to the bankruptcy filed by Plaintiffs. Any defense put forth by Defendants in this proceeding can only constitute a good faith exception, as no other reasonable explanation can be made for the conduct and actions of Defendants. Any allegation of a good faith exception should not be allowed.

77.     Specifically, Defendants violated the part of the Bankruptcy Court's Discharge Order pertaining to 11 U.S.C. §524(a)(2) which "operates as an injunction against the commencement, or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtors, whether or not the discharge of such debt is waived;…"'

78.     No exceptions exist under 11 U.S.C. §524 or the other provisions of the United States Bankruptcy Code or other applicable law that permit the conduct of Defendants at issue with regard to the discharge injunction, as stated above.

79.     The orders and injunctions of the Bankruptcy Court cannot be waived, except by the virtue of a properly filed and approved reaffirmation agreement, motion, stipulation or complaint. None of the aforementioned has been approved by the Court here, and no waiver of the orders or injunctions of the Court has occurred in Plaintiffs' Bankruptcy Case as pertaining to the rights and remedies of Defendants.

80.     Also, there is no requirement of mitigation on the part of Plaintiffs that is relevant to violations of the orders and injunctions of the Bankruptcy Court. Any attempt to burden Plaintiffs with policing the misconduct of Defendants would be a complete derogation of the law. It is well settled that each party to an injunction or order of the Court is responsible for ensuring its own compliance with the injunction or order and for shouldering the cost of compliance. Any such defense would constitute a collateral attack on the injunctions and orders of the Bankruptcy Court in this proceeding, which is prohibited. Any defense put forth by Defendants in this case can only constitute a claim of mitigation, as no other reasonable explanation can be made for the conduct and actions of Defendants. No allegation of a mitigation as a defense should be allowed.

81.     Plaintiffs have been injured and damaged by Defendants' actions at issue and are entitled to recover judgment against Defendants for actual damages and punitive damages, plus an award of costs and reasonable attorney's fees, for violations of 11 U.S.C. §524 and pursuant to the Court's powers under 11 U.S.C. § 105.

## IX. GROUNDS FOR RELIEF – COUNT VI

## VIOLATION OF THE TELEPHONE CONSUMER PROTECTION ACT (TCPA)

82.     Plaintiffs restate and reiterate herein previous paragraphs above as if set forth herein in their entirety

83.     After Plaintiffs received their bankruptcy discharge, Shellpoint made and/or initiated a series of telephone calls to them on their cellular phones (hereinafter referred to as the "Telephone Calls").

84.     The Telephone Calls were placed by Shellpoint's employees or agents.

85.     The Telephone Calls were initiated by an automatic telephone dialing system.

86.     The telephone system(s) utilized by Shellpoint to place the Telephone Calls is equipment which has/have the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

87.     The telephone system(s) utilized by Shellpoint to place the Telephone Calls can dial telephone numbers without human intervention.

88.     Defendant Shellpoint made the Telephone Calls by dialing Plaintiffs' cellular phone using its telephone system(s) and without human intervention.

89.     The Telephone Consumer Protection Act, 47 U.S.C. § 227 *et. seq*, (the "TCPA"), prohibits making "any call (other than a call made for emergency purposes or made with the prior express of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to "any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227 (b)(1)(A)(iii).

90.     Congress delegated authority to the Federal Communications Commission (FCC) to promulgate implementing regulations. 47 U.S.C. §227 (b)(2). In relevant part, the FCC's implementing regulations provide: "[n]o person . . . may (i) initiate any telephone call (other than

a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) [t]o any telephone number assigned to a . . . cellular telephone service."

91.     The TCPA creates a private federal cause of action. 47 U.S.C. §227(b)(3). A plaintiff who prevails in an action for damages under the TCPA is entitled to the greater of actual damages or $500 for each violation, plus additional damages up to the greater of $1,500 or treble actual damages for each violation committed willfully or knowingly. 47 U.S.C.   §227 (b)(3).

92.     The actions of Shellpoint in making the Telephone Calls and calling Plaintiffs on their cellular phones violated the provisions of the TCPA for which Plaintiffs seek damages. Even if the calls did not connect to Plaintiffs the attempt to make the calls is still a violation. *See Manufacturers Auto Leasing, Inc. vs. Autoflex Leasing, Inc*. 139 S.W.3rd 342, 347 (Tex. App.–Fort Worth 2004, pet denied) (citing FCC Enforcement Action Letter in Case No. EB-00TC-001).

93.     The Telephone Calls were willfully placed.

94.     The Telephone Calls were knowingly placed.

95.     The Telephone Calls were not made for emergency purposes.

96.     Plaintiffs did not give their prior express consent to be called using an artificial or pre-recorded voice or by use of an automatic dialing system.

97.     The exact dates and times of all of the Telephone Calls are unknown at this time but will be provided at the time of trial.

98.     Plaintiffs never gave Shellpoint prior express consent to call them on their cellular phones.

99.     At all times at issue, Shellpoint's employees and agents have knowingly or willfully violated the TCPA by: (1) placing numerous calls to Plaintiffs cellular phone; (2) using an automatic telephone dialer system; and/or (3) leaving an artificial or pre-recorded voice to deliver messages.

100.    The actions of Shellpoint at issue were willful and intentional.

101.    The Telephone Calls adversely affected the privacy rights that the TCPA was intended to protect.

102.    Plaintiffs have complied with all conditions precedent to bring this action.

## IX. DAMAGES

103.    All of the conduct of Defendants at issue has proximately caused Plaintiffs past and future monetary loss, past and future mental distress, emotional anguish and a discernable injury to Plaintiffs' emotional state and other damages, evidence for which will be presented to the jury.

104.    At all relevant times, Defendants knew, and continue to know, that a discharge order granted by a U.S. Bankruptcy Court means discharged debts are no longer legally collectible, but Defendants have made a corporate decision to willfully and maliciously act contrary to its knowledge in its calculated decision to attempt to collect and deceptively collect on the subject discharged debt after the discharge of the subject debt in their Bankruptcy Case, at which time there was no debtor-creditor relationship between the parties and Defendants had no legal right to contact Plaintiffs or attempt to collect on the subject discharge debt as they did.

105.    After a reasonable time for discovery, Plaintiffs believe they will be able to show that despite Defendants receiving dozens, if not hundreds, of disputes complaining that

Defendants were illegally attempting to collect on debts discharged in bankruptcy, Defendants intentionally and knowingly have not corrected its policy of engaging in these actions.

106.    After a reasonable time for discovery, Plaintiffs believe they will be able to show that all actions taken by employees, agents, servants, or representatives of any type for Defendants at issue were taken in the line and scope of such individuals' (or entities') employment, agency, or representation.

107.    After a reasonable time for discovery, Plaintiffs believe they will be able to show that all actions taken by Defendants at issue were performed maliciously, wantonly, recklessly, intentionally or willfully, and with either the desire to harm Plaintiffs and/or with the knowledge that its actions would very likely harm Plaintiffs and/or that its actions were taken in violation of the law.

108.    After a reasonable time for discovery, Plaintiffs believe they will be able to show Defendants have engaged in a pattern and practice of wrongful and unlawful behavior with respect to attempting to knowingly collect on discharged accounts in accordance with its policies and procedures, and Defendant is subject to punitive damages, statutory damages, and all other appropriate measures to punish and deter similar future conduct by Defendant and similar companies. Moreover, Plaintiffs' injuries resulted from Defendants' malice and/or actual fraud, which entitle Plaintiffs to punitive damages.

109.    Defendants' conduct reveals a conscious and reckless disregard of Plaintiffs' rights. The injuries suffered by Plaintiffs were attended by circumstances of fraud, malice, and willful and wanton misconduct entitling Plaintiffs to punitive damages pursuant 15 U.S.C. § 1681n(a)(2).

110.    Due to Defendant's conduct, Plaintiffs was forced to hire counsel and their damages include reasonable attorney's fees incurred in prosecuting their claims.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Gary Lee Luke and Shelley Dawn Luke, pray the Court will:

A.    Enter judgment in favor of Plaintiffs and against Defendants for statutory damages, actual damages, costs, and reasonable and necessary attorney's fees as provided by the TDCA, the FDCPA (as to Shellpoint only), the FCRA, common law claim of invasion of privacy and Plaintiffs' contempt claim for Defendants' violation of the bankruptcy discharge injunction;

B    Find that appropriate circumstances exist for an award of punitive damages to Plaintiffs;

C.    Award Plaintiffs pre-judgment and post-judgment interest as allowed by law; and

D.    Grant such other and further relief, in law or equity, to which Plaintiffs might show he is justly entitled.

Respectfully submitted,


/s/ James J. Manchee
James J. Manchee
State Bar Number 00796988
jim@mancheelawfirm.com
Marilyn S. Altamira
State Bar Number 00796119
maltamira@mancheelawfirm.com
MANCHEE & MANCHEE, PC
2745 North Dallas Parkway, Suite 420
Plano, Texas 75093
(972) 960-2240 (telephone)
(972) 233-0713 (fax)


COUNSEL FOR PLAINTIFFS

28

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

10/05/15                                      /s/ James J. Manchee
Date                                        James J. Manchee